UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CERTAIN UNDERWRITERS AT LLOYD'S LONDON,<br><br>                                    Plaintiff,<br>v.<br><br>COLUMBIA CASUALTY COMPANY and ADMIRAL INSURANCE COMPANY,<br><br>                                    Defendants. | Case No.: 23-cv-02157-AJB-DDL<br><br>**ORDER RE: DEFENDANTS' MOTIONS TO DISMISS**<br><br>**(Doc. Nos. 34; 35)** |

Before the Court are two motions seeking to dismiss plaintiff Certain Underwriters at Lloyd's, London's ("Underwriters") first amended complaint filed by Admiral Insurance Company ("Admiral") (*see* Doc. No. 34) and Columbia Casualty Company ("Columbia") (*see* Doc. No. 35). For the reasons set forth herein, the Court **GRANTS** Admiral's motion to dismiss and **GRANTS in part and DENIES in part** Columbia's motion to dismiss.

**I.   BACKGROUND**

This action concerns a dispute between three insurers—Underwriters, Columbia, and Admiral—over their obligations to Sharp Healthcare ("Sharp"), whom all three insure. (First Am. Compl. ("FAC"), Doc. No. 33 ¶¶ 20–53.) From 2017 through 2021, Sharp was sued in eighteen lawsuits by patients who believed Sharp had intentionally failed to

disclose that hidden cameras were installed in operating rooms and were recording their procedures in order to investigate drug theft ("Patient Video Actions"). (FAC ¶¶ 13–15.) The consolidated suits brought claims of fraudulent concealment, breach of fiduciary duty, invasion of privacy, negligence, negligent infliction of emotional distress, and unlawful recording of confidential information. (*Id.* ¶ 14; *see also* Doc. No. 33-1 (first amended complaint in consolidated state court action against Sharp).) Sharp tendered defense of the actions to Underwriters and Columbia, the former of which accepted Sharp's defense and tendered payment both for defense and for funding of settlements. (FAC ¶¶ 54–58.) Underwriters commenced this action to seek equitable contribution and indemnification from Columbia, and declaratory relief regarding both Columbia and Admiral. (Doc. No. 1.)

### A. Sharp's Self Insurance

At the time of the incidents, Sharp self-insured through a captive insurer[1] ("CQI Policy") to pay claims asserted against it. (FAC ¶ 17.) According to Underwriters, the CQI Policy covered the self-insured retention required by the "Healthy Facilities Umbrella Policy" issued by Columbia (*see* CNA Healthcare Facilities Umbrella Pol'y ("Columbia Umbrella Pol'y"), Doc. No. 33-2). (FAC ¶ 19.)

### B. Policies Issued by Underwriters

Underwriters allege issuing four policies to Sharp—the Cyber Liability Primary Policy (Cyber Liab. Ins. ("Cyber Liab. Pol'y"), Doc. No. 33-3; *see also* FAC ¶¶ 7, 33–40) and three excess policies (FAC ¶¶ 8–10, 41–48, 53).

#### 1. "Cyber Liability Primary Policy"

The Cyber Liability Policy provides that Underwriters agree to pay on Sharp's behalf "any **Damages** including **Costs** which **You** become legally required to pay arising out of **Claims** brought by a **Third Party**, or **Your Employees**, directors or officers resulting from an actual or alleged **Breach of Network Security or Privacy**."[2] (Cyber Liab. Pol'y at 12.)

---

[1] A "captive insurer" is "one owned by the company or companies it insures." JORDAN R. PLITT ET AL., COUCH ON INSURANCE § 1:4 (3d ed., updated Dec. 2024).

[2] All emphasis in excerpted insurance policies is from the original documents and denotes terms

2

A "breach of network security or privacy" is defined as:

    i. Any alleged violation of local, state, federal or foreign law or regulation governing the collection, storage, use, disclosure, disposal of, or transmission of **Personally Identifiable Information**; or

    ii. The actual or suspected theft, loss, failure to protect or the unauthorized disclosure of **Personally Identifiable Information** or any **Third Party's** information that is not available to the general public[.]

(*Id.* at 18; FAC ¶ 36.) "Personally identifiable information" is defined as "personal information not available to the general public," which includes but is not limited to "individual's names, addresses, telephone numbers, social security numbers, drivers' licenses, national identification numbers, IP addresses, Vehicle Registration plate numbers, facial prints, fingerprints or handwriting prints, credit card numbers, dates of birth, account relationships, account numbers, account balances, and account histories." (Cyber Liab. Pol'y at 22–23.)

Finally, the Cyber Liability Policy is to "apply in excess of any other valid and collectible insurance available to You, including any self-insured Retention or deductible portion thereof unless such Other Insurance is written only as specific excess insurance over the Limit of Liability of this Policy, or in respect of coverage afforded under Section 111.3." (*Id.* at 28; FAC ¶ 37.)

### 2. Excess Policies

Underwriters also issued three excess policies to Sharp. (FAC ¶¶ 8–10, 41–48, 53.) The First Layer Excess Policy follows the form of the Cyber Liability Policy and provides $5 million of coverage. (*Id.* ¶¶ 8, 41–42.) Underwriters' Second Layer Excess Policy provides $10 million of coverage. (*Id.* ¶¶ 9, 46–47.) The First Layer Excess Policy states that "[t]his insurance shall apply in excess of any other valid and collectible insurance available" to Sharp.[3] (*Id.* ¶¶ 43.) The Third Layer Excess Policy has a $15 million limit.

---

defined by the applicable policy.

[3] The Court notes that allegations regarding Underwriters' Second Layer Excess Policy appear to mistakenly refer to the policy as "Underwriters First Layer Excess Policy." (*Compare* FAC ¶¶ 47–48 *with*

(*Id.* ¶¶ 10, 53.) Underwriters provide no further contractual language for any of the excess policies.

### C. "Healthcare Facilities Umbrella Policy" Issued by Columbia

Columbia issued a Healthcare Facilities Umbrella Policy for Sharp that agreed:

> [s]ubject to the section entitled **LIMITS OF INSURANCE**, the Insurer will pay on behalf of an **Insured** those damages in excess of the **applicable underlying limit** that an **Insured** becomes legally obligated to pay as a result of a **claim**, including a **professional liability claim**, alleging **injury** and caused by an **incident**. The Insurer will pay such **damages** only upon exhaustion of the **applicable underlying limit**.

(CNA Healthcare Facilities Umbrella Pol'y ("Columbia Umbrella Pol'y"), Doc. No. 33-2, at 14; FAC ¶ 22.)

The "applicable underlying limit" is "the total available Limits of Insurance applicable to any **claim** or all **claims** in the aggregate, as stated in the **underlying insurance** or as provided in any **unscheduled underlying insurance**." (Columbia Umbrella Pol'y at 36; FAC ¶ 24.) "Underlying insurance" is defined as "the **self-insured retentions** and the policies of insurance listed in the Schedule of **underlying insurance** including renewal or replacement of such insurance which is not more restrictive than those listed in the aforementioned Schedule of **Underlying Insurance**." (Columbia Umbrella Pol'y at 46; FAC ¶ 24.) The policy further defines "unscheduled underlying insurance" as "insurance policies available to an **Insured** but solely to the extent such policies cover **incidents** covered under this policy (whether such policies are primary, excess, excess-contingent or otherwise) except the policies listed in the Schedule of **underlying insurance**" but it does "not include insurance purchased specifically to be excess of [Columbia's] policy." (Columbia Umbrella Pol'y at 46; FAC ¶ 24.)

///

---

¶ 46.) Underwriters thus twice allege that "[t]he 'Other Insurance' provision in the Underwriters First Layer Excess Liability policy states 'This insurance shall apply in excess of any other valid and collectible insurance available to you[,]'" but nowhere provide factual allegations regarding the "Other Insurance" provision of the Second Layer Excess Policy. (*See* FAC ¶¶ 43, 48.)

"Where there is no **underlying insurance** applicable to a **claim** covered under [Columbia's] policy, this policy applies as primary insurance on a claims made basis pursuant to all other terms and conditions of coverage." (Columbia Umbrella Pol'y at 15; FAC ¶ 23.)

Finally, the Schedule of Underlying Insurance identifies *inter alia* the CQI Policy as providing professional liability and general liability coverage to Sharp as self-insured retention in the amount of $3 million per each claim and $16 million in the aggregate. (Columbia Umbrella Pol'y at 13; *see also* FAC ¶ 26.) However, elsewhere the policy states "self-insured retention is not a primary policy." (Columbia Umbrella Pol'y at 44; *see also* FAC ¶ 29.)

D.  **"Healthcare Facility Follow Form Excess Liability Insurance Policy" from Admiral**

Finally, Admiral issued the "Healthcare Facility Follow Form Excess Liability Insurance Policy" to Sharp that agreed "to indemnify the **Insured** for **Loss** covered by the **Underlying Insurance**" and incorporated the provisions of the "Underlying Insurance" with the following exceptions: "1. any provision which applies to or imposes an obligation or duty to defend; 2. the Limit of Liability; and 3. any other term or condition which is inconsistent with any term or condition of this Policy." (Healthcare Facility Follow Form Excess Liab. Ins. ("Admiral Excess Pol'y"), Doc. No. 33-4, at 7; *see also* FAC ¶¶ 49–50.)

Admiral's obligation to "indemnify the **Insured** for **Loss** covered by the **Underlying Insurance** and this insuring agreement[ arises] only after the **Underlying Limits of Liability** and any applicable **Continuing Underlying Amount** have been actually paid." (Admiral Excess Pol'y at 7; FAC ¶ 50.)

E.  **Procedural History**

On February 26, 2024, Columbia filed a motion to dismiss for failure to state a claim. (Doc. No. 16.) In granting Columbia's motion, the Court found that Columbia was not a co-primary insurer in this action because the CQI Policy met the Columbia Umbrella Policy's definition of underlying insurance and Underwriters made no argument the

contractual language was ambiguous. (Doc. No. 24 at 6.) Additionally, the Court found that Underwriters failed to state a claim for equitable contribution and indemnification against Columbia as an excess insurer because Underwriters made no allegations that their policy limits were exhausted. (*Id.* at 7–8.)

After the Court granted leave, Underwriters filed a first amended complaint, raising claims for equitable contribution and indemnification against Columbia as a co-primary insurer and against both Columbia and Admiral as co-excess insurers and for declaratory relief against both defendants. (*See generally* FAC.) In the First Amended Complaint, Underwriters include allegations that they have exhausted the $10 million limit of the Cyber Liability Policy, the $5 million limit of the First Layer Excess Policy, and the $10 million limit of the Second Layer Excess Policy. (*Id.* ¶¶ 3, 40, 42, 46–47.)

Admiral and Columbia then filed the instant motions to dismiss. (Doc. Nos. 34; 35, respectively.)

## II.   LEGAL STANDARD

### A.   Rule 12(b)(6)[4] Motion to Dismiss

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). Dismissal is proper "where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory." *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 800 (9th Cir. 2017) (quoting *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also L.A. Lakers, Inc.*, 869 F.3d at 800 ("In conducting this review, we accept the factual

---

[4]   All references to Rule or Rules are to the Federal Rules of Civil Procedure unless otherwise stated.

allegations of the complaint as true and construe them in the light most favorable to the plaintiff.").

### B. California Law Governing Insurance Contract Interpretation

"Interpretation of an insurance policy is a question of law and follows the general rules of contract interpretation." *MacKinnon v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647 (2003), *as modified on denial of reh'g* (Sept. 17, 2003). "The fundamental goal of contract interpretation is to give effect to the parties' mutual intentions, which, if possible, should be inferred solely from the written terms of the policy." *Vons Co. v. U.S. Fire Ins. Co.*, 78 Cal. App. 4th 52, 58 (2000), *as modified*, (Mar. 6, 2000). "Policies must be interpreted as a whole, giving force and effect to every provision where possible." *Id.* "The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage controls judicial interpretation." *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.* ("*Bay Cities*"), 5 Cal. 4th 854, 868 (1993) (internal punctuation and citations omitted).

"Under California law, 'resolution of contractual claims on a motion to dismiss is proper if the terms of the contract are unambiguous[;]' [b]ut where a contract is ambiguous, the motion to dismiss must be denied." *Fine v. Kansas City Life Ins. Co.*, 627 F. Supp. 3d 1153, 1157 (C.D. Cal. 2022) (quoting *Bedrosian v. Tenet Healthcare Corp.*, 208 F.3d 220 (9th Cir. 2000) (unpublished table decision)). "An insurance policy provision is ambiguous when it is capable of two or more constructions both of which are reasonable." *Bay Cities*, 5 Cal. 4th at 868 (emphasis omitted).

### III. DISCUSSION

Underwriters' amended complaint is premised on the assertion Columbia's Umbrella Policy provides coverage at either (1) the same tier as Underwriters' Cyber Liability Policy, making Columbia a co-primary insurer, or (2) the same tier as Underwriters' First Layer Excess Policy, making Columbia a co-excess insurer. (*See generally* FAC.)

///

In its motion to dismiss, Columbia argues that its obligations are triggered only after the total applicable limits of all policies issued by Underwriters are fully exhausted because the Underwriters policies as a whole constitute "unscheduled underlying insurance" within the meaning of the Columbia Umbrella Policy. (Doc. No. 35-1 at 13–15.) Specifically, Columbia asserts that the "incidents" at the heart of the Patient Video Actions that trigger coverage under the Underwriters Policies are the same as those triggering coverage under Columbia's policy. (*Id.* at 14–15.)

As the Admiral Excess Policy is a specific excess policy that follows form to the Columbia Umbrella Policy, Admiral argues that its obligations are triggered only once the Columbia Umbrella Policy is exhausted. (Doc. No. 34-1 at 5–6, 10–14.) To that end, Admiral proffers similar arguments as Columbia to demonstrate that neither policy has been triggered yet. (*See generally id.*)

### A.   Equitable Contribution and Indemnification

"In the insurance context, the right to contribution arises when several insurers are obligated to indemnify or defend the same loss or claim, and one insurer has paid more than its share of the loss or defended the action without any participation by the others." *Fireman's Fund Ins. Co. v. Maryland Cas. Co.*, 65 Cal. App. 4th 1279, 1293 (1998). "[T]he purpose of contribution . . . is to equalize the common burden shared by coinsurers that share the same level of liability on the same risk as to the same insured."[5] *Truck Ins. Exch.*,

---

[5]   Depending on the terms, an insurance policy typically provides either primary or secondary, often referred to as "excess," coverage. *Powerine Oil Co. v. Super. Ct.*, 37 Cal. 4th 377, 398–99, *as modified* (Oct. 26, 2005). "Primary insurance refers to the first layer of coverage, whereby liability attaches *immediately* upon the happening of the occurrence that gives rise to liability." *Montrose Chem. Corp. of Cal. v. Super. Ct.* ("*Montrose III*"), 9 Cal. 5th 215, 222 (2020), *as modified* (May 27, 2020) (citation omitted) (emphasis in original). "Excess insurance, by contrast, refers to indemnity coverage that attaches upon the exhaustion of underlying insurance coverage for a claim." *Truck Ins. Exch. v. Kaiser Cement & Gypsum Corp.*, 16 Cal. 5th 67, 79 (2024) (citation omitted). "Umbrella insurance refers to coverage that 'drops down' to cover occurrences that are not covered by underlying policies of insurance," thereby functioning as either primary or excess insurance depending on the circumstances. *Powerine Oil Co.*, 37 Cal. 4th at 399 n.9. "An excess insurer's coverage obligation begins once a certain level of loss or liability is reached; that level is generally referred to as the 'attachment point' of the excess policy." *Montrose III*, 9 Cal. 5th at 222–23. As "[i]t is not uncommon to have several layers of secondary insurance," *Olympic Ins. Co. v. Emps. Surplus Lines Ins. Co.*, 126 Cal. App. 3d 593, 598 (1981), courts are sometimes called

16 Cal. 5th at 85 (internal citation and punctuation omitted). "Equitable contribution permits reimbursement to the insurer that paid on the loss for the excess it paid over its proportionate share of the obligation, on the theory that the debt it paid was *equally* and *concurrently* owed by the other insurers and should be shared by them pro rata in proportion to their respective coverage of the risk." *Fireman's Fund Ins. Co.*, 65 Cal. App. 4th at 1293 (emphasis in original).

"Equitable indemnification . . . enables an insurer that has paid an obligation which was entirely the responsibility of a co-insurer to place the complete burden for the loss on that other party[.]" *Travelers Indem. Co. of Conn. v. Hudson Ins. Co.*, 442 F. Supp. 3d 1259, 1269 (E.D. Cal. 2020) (quoting *Fireman's Fund Ins. Co. v. Commerce & Indus. Ins. Co.*, No. C-98-1060VRW, 2000 WL 1721080, at *3 (N.D. Cal. Nov. 7, 2000)). "[E]quitable contribution and equitable indemnity are not equivalent because whereas contribution requires two parties to equally share a burden, equitable indemnity requires only that one insurer pay a liability that another insurer should have discharged." *Travelers Indem. Co. of Conn.*, 442 F. Supp. 3d at 1270 (quoting *St. Paul Fire & Marine Ins. Co. v. Ins. Co. of Pa.*, No. 15-cv-02744-LHK, 2016 WL 1191808, at *7 (N.D. Cal. Mar. 28, 2016)).

### 1.     Claims Against Columbia

Based on the First Amended Complaint, Underwriters sufficiently allege claims for equitable contribution and indemnification against Columbia as a co-primary insurer but fail to state a claim for either against Columbia as a co-excess insurer.

#### i.     *Columbia as a Co-Primary Insurer*

In support of the first and second causes of action, Underwriters allege that their Cyber Liability Policy shares the same level of obligation to Sharp as the Columbia Umbrella Policy with regard to the Patient Video Actions because both policies were triggered by specific acts or omissions that led to liability and there is no underlying

---

upon, as is here, to determine relative order of secondary insurance based on scope, attachment point, and other policy provisions.

insurance that must be exhausted prior to triggering the Columbia Umbrella Policy.

First, Underwriters assert that the Patient Video Actions seek damages because of alleged violations of privacy regulations *and* the allegedly negligent "way in which Sharp organized, directed and controlled its medical operations," (Doc. No. 38 at 8), the former triggering Underwriters' Cyber Liability Policy (FAC ¶ 36) and the latter triggering the Columbia Umbrella Policy (*id* ¶ 24). The needle Underwriters seek to thread with this distinction is narrow, but in construing all facts in Underwriters' favor—as required at this stage—the basis for such potential distinction exists. (*See* FAC ¶¶ 24 (Columbia Umbrella Policy's definition of incident stemming from professional services injury), 27 (Patient Video Actions are Professional Liability Claims within the scope of Columbia Umbrella Policy's coverage), 36 (Cyber Liability Policy's definition of breach of network security or privacy), 38 ("The Cyber Select Policy does not cover the same incidents as covered by the Columbia policy and thus is not 'unscheduled underlying insurance' as that term is defined by the Columbia policy."), 55 (Columbia acknowledged its coverage "was potentially implicated" by the Patient Video Actions as a result of a "professional services injury" or "personal and advertising injury").) If the Court were to find Underwriters' interpretation correct, then the Cyber Liability Policy would not constitute "unscheduled underlying insurance" that would have to be exhausted to trigger the Columbia Umbrella Policy. (FAC ¶¶ 22, 24, 38.)

Second, Underwriters allege the Columbia Umbrella Policy provisions conflict with regard to the definition of self-insured retention as capable of providing primary insurance and expressly excluded from the definition of primary insurance. (FAC ¶¶ 28–30, 39.) This ambiguity raises the question of whether the Columbia Umbrella Policy would be considered primary insurance for the Patient Video Actions, despite the existence of the CQI Policy. (*See* FAC ¶¶ 28, 32, 39.) Columbia asserts that "the Court already rejected" Underwriters' "attempt to create the appearance of ambiguity by redefining the term 'underlying insurance'." (Doc. No. 41 at 5.) This is not accurate. Analyzing the initial complaint, the Court noted "Underwriters points to no ambiguity in the Umbrella Policy's

definition of underlying insurance." (Doc. No. 24 at 6.) However, Underwriters do allege ambiguity pointing to specific provisions and language in the amended complaint. As "[a]n amended complaint supersedes the original complaint and renders it without legal effect," *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 573 (9th Cir. 2020), the Court's prior analysis has little bearing on its analysis of this wholly different complaint.

Additionally, Columbia argues in its reply that to read both provisions together is nonsensical and thus not a "reasonable interpretation." (Doc. No. 41 at 4–5 (quoting *John's Grill, Inc. v. The Hartford Fin. Servs. Grp.*, 16 Cal. 5th 1003, 1015 (2024)).) However, the case upon which Columbia relies does not address interpretation of expressly defined terms, but rather the interpretation of the phrase "resulting from" considering its ordinary usage. *See John's Grill*, 16 Cal. 5th at 1014–15. The ambiguity raised by Underwriters is based on expressly defined terms—as defined by the Columbia Umbrella Policy itself. At this stage of the proceedings, Underwriters have sufficiently pled that the terms are capable of more than one reasonable construction. *See Bay Cities*, 5 Cal. 4th at 868. As such, interpreting the ambiguity to resolve the contractual claims on a motion to dismiss would be improper. *See Fine*, 627 F. Supp. 3d at 1157.

Based on the above, Underwriters have alleged sufficient facts, if taken as true, and presented reasonable ambiguity to support the theory that the Columbia Umbrella Policy and the Cyber Liability Policy could be co-primary insurance for the Patient Video Actions. Coupled with Underwriters' allegations that the Cyber Liability Policy and First Layer Excess Policy have been exhausted in defense of the Patient Video Actions (FAC ¶¶ 40, 42) while Columbia has paid nothing (FAC ¶¶ 54–67), Underwriters have stated a claim for both contribution and indemnification against Columbia as a co-primary insurer. Accordingly, Columbia's motion to dismiss is **DENIED** with regard to Underwriters' first and second causes of action.

            ii.    *Columbia As a Co-Excess Insurer*

In the alternative, Underwriters allege that the Columbia Umbrella Policy and Underwriters' First Layer Excess Policy "provide coverage at the same level for the claims

asserted against Sharp in the Patient Video Actions." (FAC ¶ 87; *see also id.* ¶ 45.) To support this conclusion, Underwriters point to the "Other Insurance" provisions of both policies, each of which states it applies in excess of other available insurance. (*Id.* ¶¶ 43, 44.) Beyond stating that the First Layer Excess Policy "follows the form of the Cyber Liability Policy," Underwriters provide no factual allegations regarding the applicable insuring provision.

Columbia asserts that, by nature of its policy being an *umbrella* policy, its duty is only triggered upon exhaustion of all other applicable insurance, except those that sit specifically in excess to the Columbia Umbrella Policy. (Doc. No. 35-1 at 12–16.) Columbia cites California Court of Appeal case *Carmel Development Company*,[6] for the proposition that "umbrella coverage is generally regarded "as true excess over and above any type of primary coverage, excess provisions arising in any manner, or escape clauses." (Doc. No. 41 at 4 (quoting *Carmel Dev. Co.*, 126 Cal. App. 4th at 513–14); *see also* Doc. No. 35-1 at 14 ("California courts have repeatedly held that similar policy language has the effect of making the subject policy excess over all other available coverage, including excess policies, other than coverage written specifically as excess of the subject policy.") (collecting cases).)

*Carmel* is instructive—not for the proposition relied upon by Columbia, but for the process the court engages in to determine relative coverage position. In *Carmel*, the superior court found at trial that both RLI and Fireman's Fund provided the same level of secondary coverage to their respective insureds, with mutually repugnant "other insurance" clauses "purporting to be excess over other available insurance." *Carmel Dev. Co.*, 126 Cal. App. 4th at 507, 509. The Court of Appeal noted that if the "other insurance" clauses

---

[6] *Carmel Dev. Co. v. RLI Ins. Co.* ("*Carmel*"), 126 Cal. App. 4th 502 (2005). The underlying lawsuit upon which the *Carmel* insurance action was based involved a workplace injury by a subcontracted employee. *Carmel Dev. Co.*, 126 Cal. App. 4th at 506. The employee sued the general contractor Carmel Development Company—who was insured primarily by Reliance Insurance Company and in excess by Fireman's Fund Insurance Company—and the subcontractor Largo Concrete Company—who was insured primarily by Acceptance Insurance Company and through an umbrella policy with RLI Insurance Company. *Id.*

were compared in isolation, the superior court's decision would be upheld; however, the court turned "first [to] address the underlying premise that the parties provided the same level of coverage," which required "a broader examination of each policy[.]" *Id.* at 509. Analyzing the insuring clauses instead, the Court of Appeal reversed, holding that it was "apparent from the language of these basic insuring provisions that RLI and Fireman's Fund did not place themselves in the same position with respect to other carriers." *Id.* at 509–11. Specifically, the Court of Appeal noted that "Fireman's Fund undertook to provide coverage immediately upon exhaustion of Reliance's policy limits, [Carmel's primary insurance,] whereas RLI obligated itself to step in only when the limits of *both* the Acceptance policy and *all other* available coverage—primary and excess—were exceeded[ for Largo]." *Id.* at 511. Thus, a key principle in *Carmel*—as in many of the cases cited by Columbia—is that the courts must analyze insurance policies as a whole to determine attachment points and the relation between layers of excess of insurance. *See, e.g., Advent, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 6 Cal. App. 5th 443, 446, 467 (2016).

      Here, Underwriters do not provide any factual allegations about the First Layer Excess Policy's insuring provisions or attachment point beyond that the policy follows the form of the Cyber Liability Policy and that the "Other Insurance" provisions are both drafted as laying in excess of all other available insurance. As noted by Columbia, the Court only turns to the "Other Insurance" provisions after determining multiple policies insure the same risk at the same level. *See Dart Indus., Inc. v. Com. Union Ins. Co.*, 28 Cal. 4th 1059, 1079 (2002) ("'Other insurance' clauses become relevant only where several insurers insure the same risk at the *same level* of coverage.") (emphasis in original). The Court is not persuaded at this time, however, by Columbia's argument that its policy is inherently excess over all other excess provisions by virtue of it being an umbrella policy. Rather, comparative analysis of the competing policies would be required.

      Without factual allegations supporting Underwriters' assertion that the First Layer Excess Policy shares the same level of liability as the Columbia Umbrella Policy,

Underwriters fail to state a claim for contribution or indemnification against Columbia as a co-excess insurer. Accordingly, Columbia's motion to dismiss is **GRANTED** with regard to Underwriters' third and fourth causes of action. The Court **DISMISSES** the third and fourth causes of action **without prejudice** and **GRANTS** Underwriters leave to amend to the extent they can provide sufficient factual allegations to support the conclusion that the First Layer Excess Policy shares the same level of liability as the Columbia Umbrella Policy.

### 2. Claims Against Admiral

With regard to the fifth and sixth causes of action, Underwriters' theory is that if the Court deems the Columbia Umbrella Policy to be at the same level as the First Layer Excess Policy, then the Admiral Excess Policy would be the same level as the Second Layer Excess Policy. However, Underwriters' allegations regarding the Second Layer Excess Policy suffer from the same defects as those pertaining to the First Layer Excess Policy, except to a more severe degree. Underwriters allege they issued the policy to Sharp as "a second layer of excess coverage" in the amount of $10 million that has "been exhausted by payments of the settlements reached in the Patient Video Action[s]." (FAC ¶¶ 3, 46.) The rest of Underwriters' references to the Second Layer Excess Policy are conclusions rather than factual allegations. (*See, e.g.*, FAC ¶¶ 53, 92, 98, 100–01, 104, 107–08, 111, 114, 119.) Fatally, Underwriters do not provide any factual allegations about the Second Layer Excess Policy's insuring provisions, attachment point, or even its "Other Insurance" provision.[7] Moreover, because Admiral's policy is a specific excess to the Columbia Umbrella Policy and Underwriters fail to allege sufficient facts to support that Columbia's obligations have been triggered, Underwriters fail to make such a showing with regard to Admiral.

Without factual allegations supporting Underwriters' assertion that the Second Layer Excess Policy shares the same level of liability as the Admiral Excess Policy,

---

[7] *See supra* note 3.

Underwriters fail to state a claim for contribution or indemnification against Admiral as a co-excess insurer.[8] Accordingly, Admiral's motion to dismiss is **GRANTED** with regard to Underwriters' fifth and sixth causes of action. The Court **DISMISSES** the fifth and sixth causes of action **without prejudice** and **GRANTS** Underwriters leave to amend to the extent they can provide sufficient factual allegations to support the conclusion that the Second Layer Excess Policy shares the same level of liability as the Admiral Excess Policy.

### B.     Declaratory Relief

"In a case of actual controversy within its jurisdiction," with limited exceptions inapplicable to the instant action, "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *see also* Cal. Civ. Proc. Code § 1060 ("Any person interested . . . under a contract . . . may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action . . . ask[ing] for a declaration of rights or duties, either alone or with other relief; and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time.").

Here, Underwriters state a claim for declaratory relief against Columbia for the same reasons Underwriters state a claim for the first and second causes of action. *See supra* § III.A.1.i. Columbia and Admiral assert Underwriters' declaratory relief claims should be dismissed because providing declaratory relief would be "unnecessary" or serves "[n]o purpose" because sufficient remedy, if any is available, may be pursued through Underwriters' claims for equitable contribution and indemnification. (Doc. Nos. 34-1 at 14; 35-1 at 19.) Although "[d]eclaratory relief should be denied when it will neither serve

---

[8]     Admiral also argues that Underwriters appear to seek indemnification for payments made pursuant to the Second Layer Excess Policy beyond their fair share. (Doc. No. 34-1 at 10–11; *see also* FAC ¶¶ 106–12.) The Court agrees that taken alone this appears to be a contribution argument; however, Underwriters also allege that they exhausted the Second Layer Excess Policy and continue to fund settlements, and that they seek judgment that Admiral must contribute to exhaustion before the Third Layer Excess Policy is triggered. (FAC ¶¶ 2–3, 53, 105, 112, 119.) Admiral does not address these allegations, but the Court need not either as the indemnification claim fails on other grounds.

a useful purpose in clarifying and settling the legal relations in issue nor terminate the proceedings and afford relief from the uncertainty and controversy faced by the parties[,]" *United States v. State of Wash.*, 759 F.2d 1353, 1357 (9th Cir. 1985), such an issue is not appropriate to decide on a motion to dismiss. Having found Underwriters state a claim for declaratory relief against Columbia, the Court **DENIES** Columbia's motion to dismiss the seventh cause of action.

However, because the Court has dismissed all other claims against Admiral commensurate with the claim for declaratory relief, there is no longer an actual controversy existing to support a claim for declaratory relief against Admiral. As such, the Court **GRANTS** Admiral's motion to dismiss the eighth cause of action. The Court **DISMISSES** the eighth cause of action **without prejudice**.

## V.   CONCLUSION

Accordingly, for the reasons stated herein, the Court **GRANTS** Admiral's motion to dismiss (Doc. No. 34) and **GRANTS in part and DENIES in part** Columbia's motion to dismiss (Doc. No. 35). Any amended complaint, if Underwriters intend to file one, must be filed **no later than May 16, 2025**. Responses must be filed by Admiral and Columbia **no later than May 30, 2025**.

**IT IS SO ORDERED**.

Dated: May 2, 2025

Hon. Anthony J. Battaglia
United States District Judge